719 So.2d 146 (1998)
STATE of Louisiana, Appellee,
v.
Darrien BROWN, Appellant.
No. 31123-KA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1998.
*147 Pamela G. Smart, Assistant Indigent Defender, for Appellant.
Richard Ieyoub, Attorney General, Paul Carmouche, District Attorney, Catherine M. Estopinal, Assistant District Attorney, for Appellee.
Before HIGHTOWER, BROWN and STEWART, JJ.
BROWN, Judge.
Defendant, Darrien Wayne Brown, was convicted of the aggravated rape of a 70-year-old woman. Defendant has appealed his conviction. We affirm.

Facts
On the morning of July 28, 1996, the elderly victim arose at approximately 6:30 a.m., as *148 was her custom. She dressed and went outside to retrieve her newspaper before getting ready for church. While in her driveway she noticed some grass clippings that needed to be cleaned up. As she was picking up the clippings she was approached by a young black male whom she later identified as defendant.
Defendant asked the victim about her family, claiming he was interested in her insurance needs. The victim, feeling uncomfortable, began to return to her house after picking up a second pile of clippings. Defendant followed her and after she had put up her yard utensils, grabbed her from behind and dragged her to an alpine house in her backyard.[1]
The victim screamed and struggled, but was unsuccessful in evading defendant. In fact, defendant struck the victim across the face, knocking off her glasses. Once inside the alpine house defendant threatened the victim with the alleged possession of a gun and ordered her to remove her clothing. The victim, out of fear of great bodily harm, complied. After further physical assaults including trying to strangle the victim, defendant raped her on the floor of the alpine house.
Defendant then told the victim to get dressed and asked if she had any money in her home. The victim replied that she had three twenties and a ten and defendant forced her into her home, again threatening to shoot her. Once in the victim's home, defendant followed her to the bedroom where she kept her purse. The victim initially gave defendant only the three twenties, but he demanded the ten as well.
Defendant threatened to kill the victim if she reported him to the police and then fled the house. The victim called a friend who then called the police. The crime was initially reported only as a robbery. However, when the officer was questioning the victim about the robbery she broke down in tears and told him about the rape.
The victim described her attacker as being a black male with a short hair cut, a horizontally striped shirt with blue-gray and white stripes and a pair of dark colored shorts. The investigating officer remembered receiving a similar description earlier that morning from another complainant, Dewalia Hill.[2] Ms. Hill had also reported that she had known the man for about three years and that his name was Darrien Brown. The officer returned to Ms. Hill's home to question her further.
Ms. Hill gave a similar description of defendant and the general location of his home. Although her description of defendant's shirt differed somewhat from that of the victim's in the colors it contained, the rest of the description matched.
Feeling that he may have the identity of the victim's attacker, the officer went to defendant's home to question him at approximately 9:00 a.m. Defendant's mother answered the door and stated that defendant was sleeping and that she had seen him in his bed as early as 7:00 a.m. or so. She called defendant's name a few times and he came out wearing only a pair of shorts that appeared to be for sleeping. The officer asked defendant to get dressed so they could talk outside. The officer followed defendant to his room and there saw a shirt and pair of shorts closely matching the descriptions he had been given by the victim and Ms. Hill.
Once outside the officer told defendant he was there to discuss the complaint from Ms. Hill. At that point defendant fled. He was later apprehended and arrested for fleeing from an officer. The shirt and shorts were retrieved from defendant's home and he was photographed wearing them.
A potential witness, Mrs. Gorsulowsky, informed the police that she may have seen the victim's attacker that morning when she jogged by the victim's home. She stated that she had seen a black male, whom she thought was helping the elderly victim with her yard *149 work, as she jogged by at approximately 7:00 a.m. that morning.
The police showed the victim and Mrs. Gorsulowsky, separately, a photographic line-up consisting of six pictures. Both the victim and Mrs. Gorsulowsky identified defendant's photograph. They were each also shown the photo of defendant in the retrieved clothing. Although it is not clear where that picture was when the line-up was being shown, both the victim and Mrs. Gorsulowsky testified that it did not influence their decisions in picking out defendant's photo from the line-up.
The victim was taken to LSU Medical Center that same morning where she was examined and a rape kit was completed. The kit included all of the victim's clothing that she was wearing at the time of the attack, as well as biological samples. The kit was sent to the North Louisiana Crime Lab along with a sample of defendant's blood. At trial a DNA expert, Ms. Dawn Tingle, testified that defendant's DNA, which was found to be present in a sample tested from the victim's panties, was narrowed to a field of one in over 622,500 members of the black population.
Defendant was charged with aggravated rape and first degree robbery. A jury found him guilty of aggravated rape, but acquitted him of the robbery charge. Thereafter, the trial court sentenced defendant to life imprisonment without benefit of probation, parole, or suspension of sentence.

Discussion

Denial of Post-Trial Motions/ Sufficiency of the Evidence
Defendant alleges that the trial court erred in denying his motions for a new trial and for post-verdict judgment of acquittal because the evidence presented at his trial was insufficient to support his conviction of aggravated rape. Defendant questions the reliability of the DNA evidence as well as the identifications of him as the assailant.
La.C.Cr.P. art. 851(1) provides that the court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence. A motion for new trial presents only the issue of the weight of the evidence. Under article 851(1), the trial court has wide discretion to determine the weight of the evidence and refusal to grant such a motion is not subject to appellate review, except for error of law. State v. Mitchell, 26,070 (La.App.2d Cir.06/22/94), 639 So.2d 391, writ denied, 94-1981 (La.12/16/94), 648 So.2d 387.
La.C.Cr.P. art. 821 provides that a motion for post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in the light most favorable to the state, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992).
The relevant inquiry when reviewing a conviction for the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
With these legal precepts in mind, we will address defendant's various arguments related to the sufficiency of the evidence.

DNA Evidence
Defendant alleges that the trial court erred in allowing the use of DNA evidence because of its unreliability.
The results of DNA and RFLP analysis are generally admissible in Louisiana so long as the trial court's gatekeeping function has been performed in accordance with the Daubert/Foret test. State v. Quatrevingt, 93-1644 (La.02/28/96), 670 So.2d 197, cert. denied, ___ U.S. ___, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996). The reliability of scientific evidence is to be ensured by the requirement that there be a valid scientific connection to the pertinent inquiry. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); State v. Foret, 628 So.2d 1116 (La.1993). This connection is to be examined in light of a preliminary assessment by the trial court of whether the reasoning and *150 methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology can be applied to the facts at issue. Daubert, supra; State v. Foret, supra. In considering whether scientific evidence is reliable, the trial court should consider the following factors suggested in Daubert: (1) the testability of the expert's theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether the methodology is generally accepted in the scientific community. State v. Quatrevingt, supra; Daubert, supra.
Specifically, defendant alleges that the evidence is unreliable because of mistakes made by the crime lab in preparing the DNA report and because of alleged deviations away from the standard methodology.
Ms. Tingle testified that she did make mistakes in transposing the case number on the report; however, the mistakes were corrected and the actual samples were never mixed up or labeled incorrectly. The case number which was transposed was a murder case that did not involved DNA typing. Ms. Tingle also testified that she rechecked her results to make sure that they were not affected. This argument lacks merit.
Defendant also alleges that Ms. Tingle altered the reagents and protocols from the recommended levels in performing the tests and that the statistical number linking him to the rape of the victim was increased by testing several probes on the samples. Defendant also complains that the amount of the solution used in extracting the DNA from the semen stain found in the victim's panties was altered making the tests unreliable.
While being cross-examined, Ms. Tingle testified that since the semen stain was large, more than the recommended amount of solution had to be added to the stain in order for the stain to dilute it. She stated that the company which produced the DNA kit made a recommendation concerning the amount of solution to use. She added that most of their testing procedures followed a set protocol, but that some procedures could be altered if necessary. This does not show that the procedure used in the DNA test was non-uniform or unreliable.
Defendant also alleges that the number of probes used in testing for DNA matches made the statistical number higher than it would have been had fewer probes been used, and therefore made the tests unreliable. However, Ms. Tingle testified that the probes were actual locations on a chromosome. By running more probes you can either eliminate the suspect because there are fewer matches out of those tested or more accurately confirm a suspect because you will have more matches to compare.
The DNA test concluded that the DNA in defendant's blood matched the DNA in the semen found in the victim's panties to the likelihood that only 1 in approximately 622,000 people in a black population would have those characteristics. Ms. Tingle testified that running all seven probes was standard procedure and that all seven probes were run in all cases if enough semen was present. Defendant offered no evidence showing that this varies from standard practice or is in any way unreliable. These assignments are without merit.

Visual Identification
At trial, both the elderly victim and Mrs Gorsulowsky identified defendant. Also, both witnesses identified defendant from a photo line-up on the day of the incident. As discussed above, the DNA evidence linked defendant to the crime. Defendant's only witnesses were his mother and brother. They both testified that defendant was at home and in bed at the time of the incident. The jury chose to believe the state's witnesses.
Defendant alleges, however, that the victim's identification of him was unreliable because of her testimony that a single polaroid of him was lying on a table when she viewed the photo line-up. The polaroid of defendant was taken the day of the incident, and he was wearing the clothes found in his room (striped shirt and dark shorts) which were similar to the description given by the victim and Mrs. Gorsulowsky of the clothes worn by the victim's assailant. When asked about the photo line-up and the polaroid on *151 cross-examination, the victim stated that said she thought she was shown the photo line-up first, and she thought the polaroids were lying on the table when she viewed the photo line-up, but that they did not influence her decision.
Assuming the victim did not see the polaroids before viewing the photo line-up, her identification of defendant is not unreliable. She testified that she saw her attacker's face both before and during the attack. Even if we assumed that the victim saw the polaroid before viewing the photo line-up, her identification of defendant can still be considered reliable.
Despite the existence of a suggestive pre-trial identification, an in-court identification may be permissible if there does not exist a very substantial likelihood of irreparable misidentification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). If there is a suggestive identification procedure, the courts must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification does present a substantial likelihood of misidentification. Id. These factors include: (1) the opportunity of the witness to view the criminal at the scene of the crime; (2) the witness's degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; (5) the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. Id.
(1) In the instant case, the victim had a good opportunity to view her attacker as she saw him in her front yard before her attack and she saw his face during the rape. She was wearing prescription sunglasses prior to the attack and her attacker was about an arm's length away. Even though she lost her glasses in the attack, the victim testified that she could still see him well during the rape because her glasses are only necessary for reading fine print.
(2) The victim's degree of attention was likely quite high as she saw her attacker both before and during the rape. The only testimony in the record by which to judge the degree of attention the victim paid to her attacker was that she said that she could see him clearly and she was able to give the police a description.
(3) The victim's prior description of her attacker was fairly accurate. She told the officer that her attacker was a light-colored black male with long hair on the top and short on the side. She said he was wearing a white shirt with dark horizontal stripes and blue shorts. Clothes matching this description were found in defendant's home.
(4) At trial, the victim pointed out defendant as her attacker and said she had no doubts. One year earlier, she viewed the photo line-up and picked defendant out. She stated that picture No. 3 was the face of her attacker but that picture No. 4 had short hair like her attacker. After stating that the hair was different, she identified defendant's picture as the picture of her attacker. In the polaroid pictures taken the day of the incident, defendant's hair was much shorter than in the line-up picture. When shown the polaroids of defendant, the victim identified him as the attacker.
(5) The victim identified defendant's photographs on the same day that she was attacked. The trial occurred about one year after the attack. When weighed against the corrupting effect of the suggestive identification, these factors indicate that the victim's identification of defendant was reliable.
Mrs. Gorsulowsky testified that she was running the morning of the incident and that she passed by the home of the victim. After hearing about the incident later that morning, she notified the police regarding what she had seen. The police came to her house at about 12:30 that afternoon and she was shown the photo line-up and the polaroids. Mrs. Gorsulowsky identified defendant as the man she saw talking with the victim, and she said she had no doubts about the identification as she came within five or six feet of him while running.
Mrs. Gorsulowsky further testified that she did not know where the polaroids were when she was shown the line-up, but she did state that the officer did not show her the *152 polaroids until after she had looked at the line-up. She stated that the photo line-up was in a folder and after the folder was taken away, she was shown the polaroids.
Finally, defendant alleges that not only did the court err in allowing Ms. Hill's testimony, but that the description she gave of the shirt he was wearing was different from the descriptions given by the victim and Mrs. Gorsulowsky. This argument, which goes to the weight of the evidence, was clearly within the province of the jury. This assertion has no merit. The fact that Ms. Hill's description of the color of defendant's shirt differed from the other witnesses does not make the identifications by those other witnesses any less reliable. A positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Davis, 27,961 (La.App.2d Cir.04/08/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12.
As to the admission of Ms. Hill's testimony, defendant complains that he was not given adequate Prieur notice of the prosecution's intention to use Ms. Hill's testimony, which was prejudicial as it was used solely to show his bad character.
In State v. Jackson, 625 So.2d 146 (La.1993), the Louisiana Supreme Court stated the requirements for the admissibility of other crimes evidence:
Generally, evidence of other acts of misconduct is not admissible; however, there are statutory and jurisprudential exceptions to this rule. One exception is when the evidence of other acts tends to prove a material issue and has independent relevance other than showing the defendant is a man of bad character. Evidence of other acts is allowed to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." LSA-C.E. art. 404(B)(1). One of these factors must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible. (Citations omitted).
Ms. Hill's testimony had independent relevance as it identified defendant and placed him walking in the direction of the victim's home just prior to her rape. This testimony not only explicated the investigation that led to defendant's arrest, but also disputed his alibi. Further, it is not apparent that there was a crime committed against Ms. Hill.
Defendant's allegation that he was prejudiced because he was not notified of Ms. Hill's testimony is without merit. The trial in this case began on July 7, 1997. On October 22, 1996, the prosecution provided defendant with its discovery responses which stated the intent to introduce all evidence referred to in the responses at trial. Included were references to the report of Ms. Hill's complaint against defendant. On June 27, 1997, defendant filed a motion in limine seeking to exclude Ms. Hill's testimony at trial. It is apparent that defendant knew of the state's intention to have Ms. Hill testify and that he knew the substance of the testimony.
In determining whether reasonable notice was given to defendant concerning the state's intent to use other crimes evidence, the court must first consider whether defendant had sufficient time to adjust his trial strategy. State v. Powell, 28,788 (La.App.2d Cir.11/1/96), 683 So.2d 1281, writ denied, 97-0092 (La.05/30/97), 694 So.2d 243. Through the state's discovery responses defendant knew for more than eight months prior to trial that there was a possibility that Dewalia Hill would testify. Defendant had adequate time to prepare for the testimony of Ms. Hill. Nonetheless, in the event Ms. Hill's testimony was improper the error was harmless. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94.[3]
As to Ms. Hill's identification of defendant, we also note that the victim identified him as her attacker. Additionally, Mrs. Gorsulowsky identified defendant as the man she saw in the victim's yard shortly before the incident. Ms. Hill's description did not have any relationship to the rape of the victim other *153 than placing him headed in the direction of the victim's home very close to the time she was raped.
In summary, viewing the evidence in the light most favorable to the prosecution, we find that the evidence was sufficient for the jury to find that defendant committed aggravated rape.[4] The victim, who was 70 years old on the date of the attack, testified that she was forcibly raped by defendant, whose identity was confirmed by two other witnesses, as well as DNA evidence. These assignments of error are without merit.

Additional Evidentiary Issues
Defendant alleges that the court erred allowing the testimony of Dr. Frederick Kinder. According to defendant, he did not receive Dr. Kinder's medical report concerning his examination of the victim and preparation of the rape kit at LSU Medical Center until the morning prior to Dr. Kinder's testimony. The prosecution also received the report for the first time that morning as well and immediately provided defendant with a copy. The report had been inside the rape kit at the crime lab. The trial court allowed Dr. Kinder to testify, but first offered defense counsel an opportunity to question the doctor before his testimony. Defense counsel, however, declined the offer stating, "I think we will be O.K., your Honor."
There is no duty on the part of the state to disclose information which it does not possess. State v. Williams, 448 So.2d 659 (La.1984). Therefore, exclusion of evidence is a sanction which is not available where the state has promptly informed the defendant of the receipt of additional evidence, even though the new material is uncovered at an inopportune time for the defense. Id.
Furthermore, admission of Dr. Kinder's report did not prejudice defendant. Dr. Kinder only collected the samples for the sexual assault kit and examined the victim's physical condition. This assignment lacks merit.
Defendant also asserts that the trial court erred in allowing inadmissible photographic evidence at trial and in allowing testimony regarding the items in the photographs. During Dawn Tingle's testimony, the prosecution presented photographs of the sexual assault kit, the DNA collection kit, the victim's clothes and the samples taken from defendant instead of the actual items. Defendant objected to the admission of the photographs and Ms. Tingle's testimony regarding the DNA analysis since the actual items tested were not presented.
Photographs are admissible when shown to correctly portray the subject matter in question and to shed light on the matter before the court. State v. Grillette, 588 So.2d 1338 (La.App. 2d Cir.1991). Ms. Tingle identified the photographs as depicting the materials received and tested by the crime lab and attested to their chain of custody. In addition, she testified that she was the one that drew blood from defendant for the DNA tests. As Ms. Tingle was the person who conducted the DNA tests, she was in the best position to identify the materials used in the tests.
Photographs may serve in lieu of actual, physical objects, unless prejudice is shown. State v. Lowe, 485 So.2d 99 (La.App. 2d Cir.1986), writ denied, 488 So.2d 199 (La. 1986). The failure to introduce the actual evidence in no way prejudiced defendant. The items themselves would not have aided the jury in any way. Ms. Tingle testified as to the materials used in the DNA tests and as to how those tests were conducted. The jury determined the relevancy of the tests based upon this. Having the actual items in the courtroom would not have helped the jurors in making their decision. This assignment has no merit.
Defendant also alleges that the trial court erred in allowing Dawn Tingle to testify as an expert in DNA analysis. Ms. Tingle has worked for the North Louisiana Crime Lab since 1990, starting shortly after earning her Bachelor of Science in Biology. She has *154 supervised the DNA and serology sections of the lab since 1993 and has been accepted as an expert in DNA analysis in Caddo Parish at least ten times. In fact, in State v. Small, 29,137 (La.App.2d Cir.4/2/97), 693 So.2d 180, this court noted that Ms. Tingle was qualified as an expert in DNA analysis, citing her experience at the crime lab and her previous qualifications as an expert. The trial court has great discretion is deciding which witnesses are qualified as experts. State v. Mays, 612 So.2d 1040 (La.App. 2d Cir.1993), writ declined, 619 So.2d 576 (La. 1993). This assignment of error is without merit.

Error Patent Review
Because the trial court did not inform defendant that the prescriptive period for post-conviction relief begins to run from the date the conviction and sentence become final, we direct the court to provide such notice to defendant within 10 days of this opinion and to file proof of defendant's receipt of said notice in the record.

Conclusion
For the reasons set forth above, defendant's conviction is AFFIRMED.
NOTES
[1] An alpine house is similar to a green house but is used more for the storage of plants in the winter.
[2] Ms. Hill had called at approximately 6:00 a.m. that morning complaining that defendant had followed her home and was currently on her porch showing no signs of leaving.
[3] We note again that it is not apparent that this was another crime.
[4] La. R.S. 14:42(A) provides that a rape committed upon a person 65 years of age or older is an aggravated rape. La. R.S. 14:41 defines rape as the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.