kGOTHARD, Judge.
Plaintiffs/appellants, Annette and Marion Perret, appeal a decision of the 24th Judicial District Court which rendered judgment in their favor for a total of $22,620.32 as compensation for injuries sustained in an automobile accident. Appellants assert that the judgment is inadequate to compensate them for the damages sustained which total about $200,000.00. They maintain that the inequity of the judgment was caused by the trial court’s reliance on the testimony of an accident reconstruction expert which was improperly admitted.
The Perrets were riding in their 1991 Ford Explorer on September 3, 1993 when they were hit from the rear while stopped for traffic on Seventeenth Street in Metairie by defendant, Nicholas Nelson, a Jefferson Parish Sheriffs deputy. The Perrets filed a damage suit against Nelson and Harry Lee, Sheriff of Jefferson Parish.
bln a consolidated ease, Hartford Insurance Company (Hartford) filed suit against the same two defendants for funds paid out under the Perrets’ insurance policy as a result of the accident. Hartford settled with the defendants and subsequently filed an order of dismissal which was granted on June 27,1998. Thus, although the two matters are consolidated on appeal, the action brought by Hartford leaves nothing for our review.
Before trial the plaintiffs filed a “Motion in Limine” seeking to exclude the testimony of Michael G. Sunseri on the basis that his testimony, as offered in his pre-trial deposition, did not meet the criteria in Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579, 113 S.Ct. 27886 (1993). After a hearing, the trial court denied the motion and the matter proceeded to a bench trial, after which the court rendered judgment in favor of Annette Perret in the amount of $11,-000.00 and in favor of Marion Perret in the amount of $11,620.32. • It is from that judgment that plaintiffs appeal.
*1120 There are no issues of fault raised in this Court. The issues presented for our consideration are limited to causation. In four assignments of error, appellants argue that the trial court committed legal error in failing to exclude certain expert evidence and in the consideration of that evidence at trial.
At the trial on the merits, the court heard testimony from Marion Perret, who testified that he was stopped in traffic on Seventeenth Street, when their vehicle was struck from the rear. Mr. Perret was driving and his wife was seated in the front passenger seat. Mr. Perret’s testimony was that the impact was severe, causing him to experience two sharp “lightening-like stings” emanating from the neck area down the right shoulder, arm and hand. He stated that the pain then went across his lower back and down the right leg into the foot. He ^testified that he had no pain in either his neck or back before the accident. The couple had just come from the post office and Mrs. Perret had mail on her lap, which was knocked to the floor by the force of the impact. After the accident, Mr. Perret was “in shock” and remained in the car for about five minutes. Although his foot was on the brake before and during the impact, his vehicle was pushed forward about twelve to fourteen feet. The driver of the other car tapped on the window to ascertain if anyone was hurt, and shortly several police officers were on the scene. The parties remained at the scene of the accident for over an hour while the officers were making an accident report. During that time Mr. Per-ret continued to have pain in his neck, arm, hand, back, leg and foot.
Mr. Perret stated that the damage to his vehicle seemed to be negligible, with some minor damage to the bumper and trailer hitch. Mr. Perret explained that he had a seventy-five hundred pound cross-bar tow trailer hitch on the rear bumper of his vehicle.
After the incident the couple drove home. Both Mr. Perret and his wife were experiencing similar symptoms which required hot compresses that evening, and were unable to sleep. Mr. Perret arose at 4:30 a.m. the next morning and attempted to make coffee, but the process was difficult because his left hand was shaking. Later that afternoon, Mr. Perret sought medical attention at the emergency room of Elmwood Medical Center. After an examination, the emergency room physician diagnosed a possible fractured disc and notified Mr. Perret’s personal physician, Dr. Bruce Razza, who came to the hospital later that day. Dr. Razza disagreed with the diagnosis, finding a degenerative disc, rather than a fracture. Mr. Perret was put in a full length neck brace and a back brace. He was given several prescriptions for pain and muscle spasms, as well as anti-_|nflammatory5 medication. Mr. Perret was treated conservatively with heat and mild exercise to strengthen the muscles in the affected area.
Mr. Perret testified that his condition worsened, making simple movements such as changing from a sitting to a standing position virtually intolerable. He stated that he needed assistance from his wife to get out of bed, or up out of a chair. The medication provided only temporary relief from the pain. A few weeks later Dr. Razza administered cortisone injections. Mr. Perret also underwent an MRI, after which a facet nerve block, or injection of anti-inflammatory medication into the spinal column, was administered. Later, an epidural block was also administered. Because none of the procedures provided effective, lasting relief, Dr. Razza recommended surgery.
Mr. Perret testified that he and his wife are self-employed. They own and operate a construction machinery and equipment business with operations in the Middle East. Before the accident, Mr. Perret would travel to the Middle East about three times a month, requiring a plane ride of about twenty-eight hours. About forty days after the accident, Mr. Perret had to make the trip. He was in extreme pain for the duration of the flight. The ordeal of the flight over made the business dealings very difficult. As he continued his business trip, which required several other flights in the area, the pain worsened. Upon his return home, Mr. Perret underwent additional diagnostic tests, and ultimately two surgeries to correct the herniated discs in the neck area and lower *1121 back. He was in various types of braces for about nine months after the surgeries.
He enjoyed considerable relief after the surgeries and was able to resume some of his normal activities. However, he suffered a recurrence of pain in his neck and right arm following a sneeze. He went to a rehabilitation center and fcwas advised to continue conservative treatment. He is now unable to participate in many of the activities he and his wife previously enjoyed such as fishing, dancing, traveling, and picking up his granddaughter. He also has persistent hoarseness and difficulty swallowing due to the scar tissue remaining from the neck surgery.
Mr. Perret also testified with regard to his wife’s problems after the accident. He related that she was involved in the family business before the accident, but was forgetful and unreliable afterward. Further, the pain and suffering both Mr. and Mrs. Perret experienced put a strain on their forty-five year marriage.
Mr. Perret acknowledged that his wife had been involved in two automobile accidents prior to the one which forms the basis on the instant lawsuit, in 1988 and 1991. In both prior accidents, Mrs. Perret made claims for physical injuries and Mr. Perret made claims for loss of consortium. Mr. Perret was confronted with his deposition in the 1988 lawsuit, in which his testimony regarding his wife’s ability to maintain her previous schedule at work and at home was adversely affected. He further stated that he and his wife were unable to engage in sexual relations due to Mrs. Perret’s injuries. Mr. Per-ret testified that the problems began to resolve shortly before the 1993 accident, and Mrs. Perret had hope for the future and her mental outlook had improved significantly, and she had shown some improvement physically. However, after the 1993 accident, she lost that hope. Although the 1991 deposition was taken about three weeks after the second accident, Mr. Perret makes no mention of the second accident when discussing his current physical and mental condition. When confronted with this omission, he justified it by saying that he was not ^specifically asked if an intervening accident had occurred. The lawsuit following the 1988 accident was settled for about $80,000.00.
Mr. Perret was also confronted with testimony offered in the current lawsuit in which he stated that he had no recollection of whether his vehicle was forced forward as a result of the impact, a disparity from his testimony at trial that it was forced forward about twelve to fourteen feet.
As to the damage to his vehicle, Mr. Perret testified that the trailer hitch on the bumper of his vehicle was damaged. However, he did not notice the damage until later because it was hidden and he had not used his trailer since the accident. He denied having any intervening accidents in which the trailer hitch could have been damaged. He collected from his insurance company for the damage to the trailer hitch, but has not yet had it repaired. He took photos of the damage about three years after the accident which were introduced into evidence at trial.
Annette Perret testified that she injured her neck and back in three rear-end collisions in 1988, 1991, and the 1993 accident which forms the basis of the instant suit. After each accident her condition worsened. Her testimony regarding the facts of the accident parallels that of her husband. She agrees their vehicle was struck from behind while they were stopped in traffic. She testified she experienced a severe jolt on impact. She, like her husband, immediately felt pain in her neck, down her right shoulder into her arm and hand. She also felt pain in her lower back, right leg and foot. She testified that she had the same pain before the accident, but it was less severe.
Mrs. Perret also gave testimony regarding the medical care obtained by the couple which shadows that given by Mr. Perret. She, like her husband, was treated by Dr. Razza subsequent to the accident and underwent a cervical and ^lumbar MRI. The final diagnosis was a bulging disc, for which she was conservatively treated. Her condition worsened and in February, 1995 after the diagnostic tests were repeated, Mrs. Perret and Dr. Razza began to discuss surgery. She had cervical and limited back surgery in April, 1995. In May, 1995 she underwent an epidural procedure to alleviate the pain in *1122 her lower back. She, like her husband, had to wear braces on her neck and back for several months following the surgeries. Nothing worked and ultimately it was necessary for Mrs. Perret to undergo a spinal fusion in October of 1995. Mrs. Perret further testified that she developed swollen knees which required surgeries in June and July of 1996.
Mrs. Perret summarized her current condition by saying that she has constant pain in her neck, jaw, lower back, and knees. She had numbness on the right side of her body and is unable to lay on either side without pain. She cannot stoop, had difficulty getting out of a chair, and can barely stand up. She can no longer do household chores or gardening. Her condition has affected her self-image and has disrupted her marriage and her life. Before the 1993 accident she had hope that her condition would improve; but now she is without that hope. She also stated that her total medical bills were $191,-900.00.
On cross-examination Mrs. Perret was confronted with her deposition given in the lawsuit following the 1988 accident. It shows that surgery was considered to resolve her pain at that time. Also, she gave virtually the same testimony regarding the status of her pain and her disability as she gave in the instant suit. She, like her husband, did not mention the accident which occurred in July, 1991 in the deposition taken in the 1988 suit even though the deposition was taken on August 15,1991, only 26 days after the intervening accident. She bgave the same response her husband gave when questioned about the omission. She replied that she was not specifically asked if she was in a subsequent accident.
When confronted with her former deposition in which she denied having been treated for any other medical or health conditions of any sort since the 1988 accident, Mrs. Perret stated that she just went to the emergency room after the accident; she hadn’t actually been treated.
Mrs. Perret also filed a lawsuit following the 1991 accident in which she gave a second deposition on August 11,1993. In that deposition, she stated she came back almost to normal again before the 1991 accident, an obvious conflict with her testimony given in the August 15, 1991 deposition as discussed above. Further, in the August 11, 1993 deposition, she complained of numbness and intense pain in exactly the same areas of her body which she asserts were injured in the September 3, 1993 accident. She testified in that deposition, taken less than a month before the accident at issue herein, that the pain had not leveled off, but had intensified and was severe. The lawsuit after the 1991 accident was settled for $165,000.00.
Nicholas Nelson, a cadet with the Jefferson Parish Sheriffs Office and defendant herein, testified that he left the First District Police Station on Hessmer Street and turned onto Seventeenth Street. Because traffic was stopped waiting for a ear to make a left turn, Mr. Nelson came to a stop about three feet behind the Ford Explorer directly in front of him. The vehicle ahead turned and traffic, including the Ford Explorer, began to flow again. Mr. Nelson took his foot off of the brake. Then the Ford stopped short and Mr. Nelson “tapped” the rear bumper. According to Mr. Nelson’s testimony, he merely removed his foot bfrom the brake and did not depress the accelerator before the Per-ret’s vehicle stopped suddenly. Mr. Nelson also testified that he participated in a reconstruction of this accident in which he drove the same vehicle.
The testimony of Michael Sunseri, a traffic accident reconstruction consultant, was offered by the defense. The plaintiffs opposed the testimony both in a motion in limine and at trial based on the restriction of expert testimony set out in Daubert, supra, and adopted in State v. Foret, 628 So.2d 1116 (La.1993). Plaintiffs’ objection to the testimony is that the test performed by Mr. Sunseri does not meet the four criteria to qualify as scientific evidence. Specifically, plaintiffs argue that Mr. Sunseri’s opinion should not be admitted because it is based on a test which was not subject to peer review, nor published. Further, he admitted there was a potential rate of error which could not be calculated, and he knew of no other accident reconstruction experts who would at *1123 tempt to measure the force of the impact in this manner.
In Daubert, the Supreme Court replaced the previously used standard of admissibility of expert testimony established in Frye v. United States, 54 App.D.C.46, 293 F. 1013 (1923) with a new standard. Under Frye, the expert opinion offered must be based on a scientific technique which is “generally accepted” as reliable in the relevant scientific community. Using Rule 702 of the Federal Code of Evidence, the Daubert court fashioned a more liberal standard which requires the trial court to act in a “gatekeeping” function to “ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable”. Daubert, supra, 509 U.S. at 589, 113 S.Ct. at 2795; State v. Foret, 628 So.2d 1116, 1122 (La.1993). To assist the trial judge in making the preliminary assessment of validity of the evidence and its applicability to the lumatter at hand, the Daubert court listed considerations which bear on the inquiry. Those are:
1. The “testability” of the expert’s theory or technique;
2. Whether the theory or technique has been subjected to peer review and publication;
3. The known or potential rate of error; and
4. Whether the methodology is generally accepted in the scientific community.
Daubert, 509 U.S. at 591-95, 113 S.Ct. at 2796-97; State v. Quatrevingt, 93-1644 (La.2/28/96), 670 So.2d 197, 204; cert. denied - U.S. -, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996).
The reasoning and holding in Daubert have been adopted by the Louisiana Supreme Court in State v. Foret, supra. The admission of expert evidence in Louisiana courts is governed by LSA-C.E. article 702, which is virtually identical to Federal Rule of Evidence 702 upon which the Daubert case was decided. Article 702 reads:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Expert testimony should be admitted whenever the trial court, after balancing the probative value against its prejudicial effect, finds that the “evidence is reliable and will aid in a decision”. State v. Quatrevingt, supra, 670 So.2d at 204, citing Foret, supra, and State v. Catanese, 368 So.2d 975, 978-79 (La.1979). Foret, supra. The four factors in the Daubert standard are guidelines to be used by the trial court in its determination of reliability of scientific evidence. In order to be admitted, evidence must rise to a thresh-oldjijjlevel of reliability. Foret, at 1123; Quatrevingt at 204. The ruling on admissibility of such evidence is subject to the discretion of the trial judge.
The trial court held a hearing on the motion in limine requesting the exclusion of Mr. Sunseri’s testimony. Plaintiffs sought, not to prevent Mr. Sunseri from testifying should he be accepted as an expert, but rather to exclude a test conducted by him to attempt to measure the force of the impact that occurred in the automobile accident. After reading the report of the test, the trial court denied the motion in limine.
At trial the plaintiffs re-urged their objection to the admission of the test results. During the qualification of Mr. Sunseri as an expert in accident reconstruction, he testified that he holds a Member Garde Membership in the Society of Automotive Engineers, which is the highest membership offered.
The specific method of testing to which plaintiffs object involves the testing of G forces on the automobile and the occupant. Mr. Sunseri explained that in the reconstruction of this accident he attempted to measure such G forces by testing the forces on the automobile. To measure the forces on the head and neck, and the back accelerations, one must measure the forces in more than one plane and direction. The equipment used measured only the G forces in one direction. Because he knew the impact was directly from the rear, he used the accelerometer to measure the G forces on the automobile. Mr. Sunseri testified that the use of the accelerometer to measure G forces is industry-wide and not unusual. Mr. Sunseri *1124 acknowledged the G force on the occupant would be different from that of the vehicle and that he knew of no specific endorsement of this procedure by the National Association of Professional Accident Reconstruction Specialists. However, Mr. Sunseri testified that there have been hmany articles discussing the differences in forces on the vehicle and on the human occupant.
Mr. Sunseri explained that his test was to measure the G forces of the vehicle and not of the occupant. He acknowledged that estimating G forces on the occupants of the automobile was not within his area of expertise and his testimony would not include such an estimate. It is also clear from his testimony that his method of measuring G forces of the vehicle with an accelerometer is an accepted industry procedure. Under these circumstances we find no error in the trial court’s decision of accept Mr. Sunseri’s testimony.
Mr. Sunseri testified that in preparation for his test, he collected various data including the depositions of the parties, a copy of the police report, and some photographs of the vehicles taken at the accident scene. The photographs, which are contained in the record on appeal, show no skid marks and only extremely minor material transfer from the bumper of the Explorer to the bumper of the Mustang. The photographs show no damage to the Explorer. Mr. Sunseri also interviewed Mr. Nelson to ascertain the distance between the Mustang and the Explorer when he started to idle into it. According to Mr. Nelson, his vehicle was about three and one-half feet away from the rear of the Explorer, which was stationary at impact.
In the test, Mr. Sunseri used a 1992 Ford Explorer. Although plaintiffs were driving a 1991 Explorer, Mr. Sunseri maintained there were no significant design changes in Ford Explorers between the years 1991 and 1995. The weight and dimensions are the same for the 1991 and 1992 Explorers. In the test, the Explorer was in neutral with the emergency brake on to simulate as closely as possible a driver sitting in traffic with his foot on the brake. Then he placed the |i4Mustang about three and one-half feet behind the Explorer. Mr. Nelson put the vehicle in gear, released the brake, and idled into the rear of the Explorer. To take measurements, Mr. Sunseri used an computerized accelerometer which was placed on the windshield of the Explorer.
In total Mr. Sunseri ran seven tests to attempt to recreate the accident as closely as possible to the actual event. Test results were compared with photographs of the vehicles after the accident. In three of the tests, Mr. Sunseri sat in the Explorer during impact. He testified that his movement was slight. From the data collected he estimated the G force of the Explorer at between 0.0124 to 0.125.
Subsequent to conducting the tests, Mr. Sunseri attended a conference on low speed impacts. At the conference he learned that the equipment used in the tests was sampling at 100 hertz, or 100 times per second, which is ten times faster than the sampling rate used in the first tests. He testified that difference accounted for the spikes in G force. To be sure his test results were not underestimating the G forces, Mr. Sunseri conducted new tests using the equipment recommended at the conference.
In the second set of tests, Mr. Sunseri got a State Trooper to drive the Mustang to ensure that the tests were conducted without bias. Mr. Sunseri used the same two cars used in the first set of tests; and set up the tests in the same manner as the previous tests. Seven new impact tests were conducted, with Mr. Sunseri seated in the Explorer for the last three tests. The results ranged from 0.326 to 0.364 G’s.
Mr. Sunseri conducted an eighth test in which he put the Mustang in drive and let it idle about five feet. He hit the brakes hard, but without skidding before hsimpacting the Explorer. The results were 0.518 G’s. Mr. Sunseri made a videotape of the second set of tests which was shown during the trial and is contained in the record on appeal.
On cross-examination, Mr. Sunseri acknowledged that if the distance between the vehicles had been greater than three and one-half feet the force of the impact would have been greater, because the Mustang would have achieved a greater velocity before *1125 impacting the Explorer. When confronted ■with data on the Ford Mustang, Mr. Sunseri acknowledged it takes more force to compress the isolator on the front of the Mustang, than is necessary on other vehicles. Further, the bumper on the Ford Explorer used in the test was the standard bumper with a trailer hitch ball, while the plaintiffs’ Explorer had a trailer towing package, a heavier duty trailer hitch. Mr. Sunseri acknowledged that difference may have a slight impact on the accuracy of the results of the tests.
The deposition of Dr. Bruce Razza, an orthopedist, was introduced into evidence and is contained in the record. In that deposition, Dr. Razza, who is the plaintiffs’ treating physician, testified that he was called to the hospital by the emergency room physician on the day after the accident to administer to Mr. Perret. After his examination, he diagnosed Mr. Perret with a recent development of neck pain causing nerve irritation which produced symptoms of pain and numbness in the right arm, and an acute lumbar strain. Dr. Razza prescribed three types of medication and a support collar for the neck region. He also scheduled a follow-up visit for September 7,1993.
On the follow-up visit, Mr. Perret complained of neck and back problems. Dr. Razza testified that Mr. Perret did not indicate that he had any prior problems with his back or neck. Conservative treatment was prescribed. When |¡6on September 28, 1993, Mr. Perret returned to Dr. Razza complaining of persisting pain in his back and neck, Dr. Razza ordered diagnostic tests. MRI’s and EMG’s were conducted which showed two ruptured discs and a moderate disc bulge in the lower back. There was evidence of nerve root pathology at two nerve root levels for his right leg. The right arm suggested early carpal tunnel syndrome and a delay of the ulnar nerve. Dr. Razza opined that the results of the tests were consistent with degeneration in the spine and injury.
In December, 1993 a facet nerve block, an injection of medication around structures in the spine which are the source of pain, was conducted. In January, 1994, a similar procedure, an epidural nerve block on his lower back, was performed. In April, 1994, when the symptoms were worsening, Dr. Razza discussed the potential role of surgical intervention with his patient.
Mr. Perret’s condition continued to worsen and surgery was performed in September, 1994. Originally Dr. Razza intended to perform the surgical procedures on both the neck and the back area during the same hospital visit. However, because Mr. Per-ret’s back surgery was so traumatic, the neck surgery was postponed to allow the patient sufficient time to recover.
Dr. Razza testified that Mr. Perret had a three-level lumber laminectomy, fusion and internal fixation, and a discectomy at L4-5 on the right side. Dr. Razza explained that he removed bony material at the lower three disc levels, and some disc material at one of the disc levels, to reheve pressure on the nerves. The surgery also stabilized the spine by a fusion in conjunction with an internal fixation. This was done by planting bone to create a bony bridge to connect up the lower four vertebral levels with screws.
|17Pr. Razza explained that the surgery was necessary because Mr. Perret had a segmental instability, or abnormal motion between the third and fourth vertebra and the fourth and fifth vertebra, because of the impaired integrity of the herniated disc. Further, he had significant irritation and displacement of the nerve root and evidence of facet subluxation, or displacement of the joints. Since the surgery, Mr. Perret has had a significant reduction in his symptoms, although he is not without pain and limitation of motion.
In November, 1994, Mr. Perret underwent neck surgery during which his cervical spine was decompressed and stabilized. Dr. Razza removed bone spurs and two ruptured discs, replacing them with bone plugs and holding everything together with a vertebra plate and screw device. The incision for this surgery was made in the front of the neck requiring the thyroid, trachea, esophagus to be retracted to one side. Although none of these structures were cut during the procedure, some scar formation did occur which has caused Mr. Perret difficulty in swallowing and in speech. The procedure was sue- *1126 cessful, although Mr. Perret has an arthritic type condition in the joints caused by the trauma which still causes pain.
Dr. Razza testified that the emergency room X-rays show significant degeneration in the neck and back which pre-existed the automobile accident. However, Dr. Razza’s opinion linked the automobile accident and the symptoms.
On cross-examination, Dr. Razza admitted that the degeneration in Mr. Perret’s spine was ongoing for a significant period of time before the accident and could have become symptomatic without trauma. He further testified that the bulges and herniations observed could have occurred simply through the ^degeneration process without any trauma whatsoever. He stated that such spontaneous development of symptoms absent trauma is common. Dr. Razza also acknowledged that when the degeneration began and how quickly it progressed would be impossible to determine without a series of diagnostic tests conducted at intervals over different periods of time prior to the accident.
Dr. Razza explained that the X-rays taken at the emergency room after the accident showed retrolisthesis, a pre-existing degeneration which was so severe the emergency room physician mis-diagnosed it as a dislocation of the vertebrae. Dr. Razza opined that the degenerative discs partially ruptured as a result of the accident. However, he admitted that his opinion was based on Mr. Perret’s statement that he had no symptoms of back or neck pain before the accident. There are no scientific objective factors upon which to base the opinion of causation.
Dr. Razza also treated Mrs. Perret. She began treatment with him in February 11, 1992 for upper and lower back pain and knee pain. These symptoms followed two automobile accidents in May, 1988 and June, 1991. She was diagnosed with chronic cervical, thoracic and lumbar spinal pain and a dashboard injury to her left knee which caused pain beneath her kneecap and cartilage trouble in her left knee. She had reached an equilibrium of ongoing symptoms. In February, 1993 surgery was discussed, but not recommended at that time. She returned to Dr. Razza in May, 1993. At that time she had lost weight and was walking about three miles a day, swimming and using a stationary bike. On September 7, 1993 her condition had worsened to the point of having to consider surgical intervention. On that day, she had increased tenderness, increased restricted motion and increased spasm in her neck and bback. In November, 1993 she had a cervical MRI which showed a mild bulge of the C4-5 disc and central disc herni-ations at C5-6 and C6-7. She also had a lumbar MRI which showed evidence of moderate disc dehydration of the Tll-12, Ll-2 and L2-3 disc levels and moderate disc narrowing, prominent dehydration, and a mild diffuse disc bulge at L3-4, prominent dehydration and a moderate diffuse disc bulge at L4-5 and mild dehydration and a mild bulge at L5-S1. Dr. Razza prescribed conservative, non-operative treatment, consisting of medication, heat, exercise, avoidance of irritation activities and the use of collars. In June, her symptoms were unchanged except that she had developed a bunion, a little painful lump in the base of her fifth metatarsal, apparently due to her altered gait.
In February, 1994, an EMG was performed which demonstrated chronic pain involving the right L4 and bilateral L5 nerve roots. In laymen’s terms she had two pinched nerves in her right leg and one in her left. An EMG taken in June, 1992 before the accident showed the nerves in the right leg were normal, indicating a worsening of her condition after the accident.
Because her cervical condition worsened, an MRI of that area was performed in April, 1995, which was compared to previous MRI’s. There was no progression from the 1991 to 1994 MRI, and only a minor progression from the 1994 to the 1995 MRI. In April, 1995, Dr. Razza was discussing possible surgical intervention of the lumbar region, but did not feel that the cervical area warranted surgery.
In October, 1995, surgery was performed in the lumbar region, which consisted of a full discectomy, laminectomies and fusion. Also, in a subsequent operation, she had a multi-level decompression and stabilization in *1127 the cervical k0area. Because her back pain continued after the surgery, a second procedure was conducted in which she underwent multi-level lumbar laminectomies and discec-tomies and fusion.
Mrs. Perret’s knee problems increased due to her back problems. She developed weakness in the main stabilizing muscle to her knee joints associated with her back and leg problems. Her knees were becoming symptomatic because they were not protected by strong quadriceps. In March, 1996 she was depressed because of the significant interference with her normal daily activities caused by the chronic pain in her back and knee. The damage to her knees required arthroscopic surgeries in June and July, 1996.
As a result of her treatment, her condition has stabilized and she is able to conduct some normal daily activities. However, she has chronic residual pain in her neck, back and knees which are activity and weather related, and have altered her lifestyle.
Dr. Razza testified that the knee damage was indirectly causally related to the automobile accident in that the deterioration of her back condition led to an accelerated degeneration and deterioration of her knees.
On cross-examination, Dr. Razza admitted that he believed surgical intervention to repair Mrs. Perret’s neck, back and knees would be necessary at some point in the future even before the accident at issue herein. He further acknowledged that there was no direct injury to Mrs. Perret’s knees in the accident. Dr. Razza also stated that the progression found in the cervical MRI’s is likely the result of the aging process as opposed to any type of trauma. He further stated that the significant symptoms which existed at the time of the neck surgery were due to the condition which pre-existed the 1993 accident, although fathere was a worsening of those symptoms after the accident. He stated that the additional levels of involvement which were evident in the 1993 MRI were more likely the result of continued degeneration as opposed to any trauma.
Also contained in the record is the deposition of Dr. J. Monroe Laborde, an expert in the fields of orthopedic surgery and biomedical engineering, which is the application of engineering science to medical science, and the overlap between biomedical engineering and orthopedic surgery known as orthopedic biomechanics.
Dr. Laborde was retained by the defendants to determine whether the impact in the accident on September 3, 1993 was sufficient enough to result in the injuries claimed by the plaintiffs. In preparation for his testimony, Dr. Laborde reviewed all of Mr. Perret’s medical records. He testified that the cervical MRI taken in November, 1993 showed abnormalities due to the- aging process. There was no evidence of fracture or a significant herniation of the type that would normally be the result of an injury. The lumbar MRI taken on the same day revealed a relatively normal spine except for aging process changes involving some disc narrowing and bulging of the discs. He did not see any neural compression or any evidence of injury. Nothing on the diagnostic tests indicated surgery was necessary on the lower back. Dr. Laborde explained that the abnormalities shown on the MRI’s were consistent with men in this age group and could be attributed entirely to the aging process. There is nothing to indicate trauma to the spine. He stated that nothing he saw in the diagnostic tests taken on Mr. Perret indicated surgery was necessary on his lumbar region. He stated that the neck area did show some abnormality which in some patients may require ^surgery. However, neither of these areas showed any indication of trauma caused injury. Dr. Laborde attributed the damage to the aging process.
Dr. Laborde also reviewed the accident reconstruction evidence, the photographs of the vehicles of the parties, and the insurance company report of damage to the plaintiffs’ car. Dr. Laborde explained that researchers have developed much less information regarding the G force on occupants in a vehicle, as compared with the information accumulated regarding the G force on the vehicle. Nonetheless, he stated that the G force shown in the accident reconstruction tests were on a low level as to the likelihood of causing any injury. Dr. Laborde did concede that some muscle strain could occur with the *1128 psychological stress which could result in muscular pain.
Dr. Laborde also testified concerning Mrs. Perret’s condition. He stated that he examined Mrs. Perret on two occasions in connection with her claim for damages in a prior automobile accident. On her first visit in November, 1993, Dr. Laborde conducted diagnostic X-rays and determined that Mrs. Perret had degenerative arthritis of the cervical and lumbar spine which probably preexisted the accident of 1991. Dr. Laborde examined Mrs, Perret again in February, 1996 after her neck and back surgery. She did not mention the September, 1993 accident and was still attributing the pain to the 1991 accident. She complained of pain in her lumbar and cervical spine as well as her knees. Dr. Laborde ordered a lumbar MRI which he compared to one taken in 1988. It confirmed the arthritic changes were due to the aging process and were a pre-existing condition to both auto accidents. She had spine X-rays taken in May of 1988 which showed the anterior pointing in the neck, again confirming that the aging process changes pre-existed the accident. She had another lumbar MRI taken in_|sApril, 1990 which showed mild disc space narrowing and darkening at L3^4 and to a lesser extent at L4-5. An MRI taken in March, 1992 showed similar degenerative changes in the lumbar region. A cervical MRI taken in November, 1993 showed narrowing and bulging of the discs consistent with the aging process. A lumbar MRI taken in February, 1993 confirmed the progression of the degeneration. Mrs. Perret’s medical records also contain an MRI of the knees taken in November, 1995 which showed a whitening of the central portion of the meniscus in the left knee consistent with degeneration, an aging process change. The right knee showed mild changes consistent with the aging process, including whitening within the meniscus. There was a possible tear of the posterior horn of the medial meniscus, of a secondary degeneration. Dr. Laborde testified that he saw nothing in her medical records and diagnostic tests to indicate that either a lumbar or a cervical fusion was indicated. He also testified that there was some indication that Mrs. Perret’s pain had a psychological component, as evidenced by the fact that the surgery did not help the pain and the pain of which she complained was constant and all over, including her tail bone. He stated that, in his opinion, there is no physical or objective evidence to connect Mrs. Perret’s surgery to the 1993 automobile accident.
To summarize, Dr. Laborde’s opinion was that the problems experienced by both plaintiffs probably pre-existed the 1991 and the 1993 automobile accidents. He found nothing to link the 1993 accident to the surgeries. The medical problems, with the exception of the torn meniscus in Mrs. Perret’s knee, related to the aging process rather than injury.
Li As previously stated, the appellants assign four errors for our review, all of which relate to the testimony and admission of the test results of Mr. Sunseri in the accident reconstruction. Appellants argue the admission and consideration of such evidence by the trial court constitutes legal error requiring a de novo review of the record by this court. We disagree for reasons discussed infra. Consequently, we will review the judgment of the trial court using a manifest error standard.
This court may not overturn a trial court’s factual finding absent a showing that the determination was manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989); Theriot v. Lasseigne, 93-2661 (La.9/15/94), 640 So.2d 1305 at 1310. Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 at 883 (La.1993); Canter v. Koehring Co., 283 So.2d 716 (La.1973). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong but whether the factfinder’s conclusion was a reasonable one. Stobart, supra, 617 So.2d at 882. Credibility determinations are subject to the strictest deference and the manifest error-clearly wrong standard demands great deference for the trier of fact’s findings. The reviewing court may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in *1129 light of the record in its entirety even though it feels its evaluations are more reasonable. Stobart, supra, 617 So.2d at 882.
Given the evidence offered at trial, we cannot find such manifest error in the trier of fact’s determination. Apparently the trial court found that the plaintiffs herein suffered some compensable injuries as a result of the accident. ^However, it did not find that the surgeries resulted from those compensable injuries. Those findings are supported, by the testimony of Dr. Laborde and other evidence in the record. Accordingly, we affirm the judgment of the trial court. All costs of this appeal are assessed to appellants.
AFFIRMED.